**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FORT SMITH DIVISION**

**MICHAEL D. HELM** **PLAINTIFF**

**v.** **Civil No. 07-2112**

**SUN LIFE ASSURANCE COMPANY OF CANADA** **DEFENDANT**

**O R D E R**

Now on this 24th day of November, 2008, comes on for consideration the captioned matter, and from the Administrative Record, and the briefs of the parties, the Court finds and orders as follows:

1. The pending action is an appeal of an administrative decision under the Employee Retirement Income Security Act ("ERISA"). When the events in suit began, plaintiff Michael D. Helm ("Helm") was the President and CEO of Sparks Health System in Fort Smith, Arkansas ("Sparks"), and was a participant in an employee welfare benefit plan (the "Plan") sponsored by Sparks and insured by defendant Sun Life Assurance Company of Canada ("Sun Life").

2. Sparks was both the Plan Administrator and the Plan Sponsor, but it delegated to Sun Life "its entire discretionary authority to make all final determinations regarding claims for benefits under the benefit plan . . . ." Where an ERISA plan administrator -- or, by extension, its delegate -- has discretionary authority to make benefits decisions, the

administrative decision is judicially reviewed for abuse of discretion. **Groves v. Metropolitan Life Insurance Co.**, **438 F.3d 872 (8th Cir. 2006).**

In abuse of discretion review, the Court must affirm the administrative decision if a reasonable person *could* have reached the same decision on the evidence before the administrator -- i.e., the evidence in the Administrative Record -- regardless of whether that hypothetical reasonable person actually *would* have reached the same decision. The quantum of proof required is "substantial evidence," which has been defined as "more than a scintilla, but less than a preponderance." **Ferrari v. Teachers Insurance & Annuity Ass'n.**, **278 F.3d 801, 807 (8th Cir. 2002).** Both the quantity and the quality of the evidence are evaluated in this light, and courts are "hesitant to interfere" with the administrative decision. **Groves**, ***supra*.**

3. The foregoing standard is not absolute and inflexible. Where a plaintiff presents "probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty," the level of deference is adjusted to take those factors into consideration. **Woo v. Deluxe Corp.**, **144 F.3d 1157, 1160 (8th Cir. 1998).** When circumstances justify application of the sliding scale approach, "the evidence supporting the plan administrator's decision must increase in

proportion to the seriousness of the conflict or procedural irregularity." **144 F.3d at 1162.**

In **Metropolitan Life Insurance Co. v. Glenn**, **--- U.S. ---, 128 S.Ct. 2343 (2008)**, the Supreme Court held that where a plan administrator (whether employer or insurance company) "both evaluates claims for benefits and pays benefits claims," a conflict exists. Based on **Glenn**, the Court concludes that the first factor of the **Woo** test is met.

4. Neither a conflict of interest nor a procedural irregularity will trigger sliding scale analysis unless it causes a serious breach of the Plan Administrator's fiduciary duty.

> The alleged procedural irregularity must have some connection to the substantive decision reached by the administrator, and give rise to "serious doubts" about whether the result reached was the product of "an arbitrary decision" or "whim," before we vary from the usual standard of review.

**LaSalle v. Mercantile Bancorporation, Inc. Long Term Disability Plan, 498 F.3d 805, 809 (8th Cir. 2007).**

An ERISA plan administrator is called upon to "discharge [its] duties in respect to discretionary claims processing solely in the interests of the participants and beneficiaries of the plan." **Glenn**, ***supra***, **128 S.Ct. at 2350** (internal quotation marks omitted). That does not mean, of course, that a plan administrator is charged with finding a way to provide benefits in every case. Fiduciary obligations extend to the plan as a whole,

and all its beneficiaries, not just the individual beneficiary, and a breach occurs when benefits are granted to an unqualified claimant, just as surely as when benefits are denied to a qualified claimant. **Barnhart v. UNUM Life Insurance Company of America, 179 F.3d 583, 586-87 (8th Cir. 1999).** However, when the financial interests of the fiduciary -- rather than the merits of the claim -- affect a benefits decision, fiduciary duty is clearly breached.

5. The alleged breach of fiduciary duty in the case at bar is Sun Life's reliance on the opinion of one medical consultant -- who only examined Helm's medical records -- rather than the opinions of four doctors who examined and/or treated Helm. The Court has also considered, in this regard, Sun Life's failure to obtain the opinion of another medical consultant who examined only records on the central issue of job stress and its impact on Helm's health.

Helm reasons that this breach was caused by the conflict of interest, and the Court finds his argument persuasive. The Administrative Record reflects that -- to the extent Helm was eligible for benefits -- he was eligible for the maximum amount, $10,000 per month. Under the Plan, benefits are payable to a predetermined Maximum Benefit Period or Normal Retirement Age, whichever is longer. For Helm, born in October, 1946, benefits would be payable until he is 66 years of age. As will be seen

from the summary below, benefits were stopped when Helm had just turned 60. An additional six years of benefits, at $10,000 per month, would cost Sun Life some $720,000.

For the reasons set forth below, the enormous savings Sun Life will realize if benefits in the case terminate as of November 30, 2006, coupled with its reliance entirely on one consultant's opinion in the face of strong, credible evidence in contradiction thereof, create serious doubts in the Court's mind about whether the result reached was an arbitrary decision. The Court will, therefore, evaluate the facts set forth in the Administrative Record with less than the usual deference to the administrative decision on appeal.

6. The Plan defines "Total Disability" and "Totally Disabled," for purposes of long term disability ("LTD") benefits, as follows:

> . . . during the Elimination Period and the next 24 months, the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation. After Total or Partial Disability benefits combined have been paid for 24 months, the Employee will continue to be Totally Disabled if he is unable to perform with reasonable continuity any Gainful Occupation for which he is or becomes reasonably qualified for by education, training or experience.

"Gainful Occupation" is defined as "employment that is or can be expected to provide an Employee with an income of at least 60% of his Indexed Total Monthly Earnings."

LTD benefits cease on the date the employee is no longer

totally disabled or,

> after the first 24 months of Total or Partial disability, the date Sun Life determines the Employee is able to perform on a full-time basis, any Gainful Occupation for which he is or becomes reasonably qualified for by education, training or experience, even if the Employee chooses not to work.

Helm's "own occupation" disability period ended on September 28, 2005, and the Plan's "any occupation" clause applies to the benefits decision in this case.

Helm's salary was such that, once the necessary adjustments under the Plan were made, any job would have to pay at least $57 per hour to amount to a "Gainful Occupation" for him.

7. The Administrative Record reflects the following medical facts relevant to the Court's decision:

* A June 3, 2002, routine physical exam by Dr. J. David Staggs, an Internal Medicine specialist and Helm's treating physician for many years, found that Helm had no problems other than occasional mild knee pain, an elevated cholesterol level, and some weight gain.

* On November 2, 2002, Helm suffered a spell of syncope[1]. He was hospitalized, and the problem was diagnosed as "severe cardiomyopathy."[2] Echocardiogram showed "[s]evere global hypokinesis of the left ventricle" and left ventricular ejection

---

[1]According to Stedman's Medical Dictionary, 28th Edition (the source of all the medical definitions in this opinion), syncope is loss of consciousness and postural tone caused by diminished cerebral blood flow.

[2]A primary disease process of the heart muscle.

fraction estimated at 17.5.

* By November 14, 2002, Helm had returned to work and was "tolerating that without difficulty."

* Echocardiogram of December 12, 2002 revealed "[f]our-chamber dilatation," "severe global hypokinesis"[3] and "left ventricular systolic function is severely depressed with ejection fraction[4] estimated at 20%." Dr. Staggs noted an intention to refer Helm to "a major center" after "we have reached medical stability."

* On February 26, 2003, Helm saw Guillermo Torre, M.D., Ph.D., Medical Director of the Heart Transplant Program at Baylor College of Medicine. Dr. Torre noted that Helm had done "extremely well" since beginning treatment, and was "able to perform all activities of daily living." He noted that Helm had a sister diagnosed with cardiomyopathy at age 32[5] and a son diagnosed with it at age 23. His impression was "non-ischemic[6] cardiomyopathy, probably hereditary," and he felt that aggressive medical therapy was important.

* On April 16, 2003, Dr. Staggs noted that Helm "has

---

[3]Diminished or slow movement.

[4]The fraction of the blood contained in the ventricle at the end of diastole that is expelled during its contraction, normally 0.55 or greater.

[5]Elsewhere a note by Dr. Nasir indicates that this sister actually died of her disease at age 32, and had previously been in good health.

[6]Meaning that the cardiomyopathy was not caused by an obstruction of a blood vessel.

functional limitations in that he fatigues very easily," has some "occasional dizziness" but no syncope, chest pain or dyspnea[7]. Dr. Staggs went on to state "We have also talked today about his work situation. I really think it would be in his best interest to seek disability and early retirement given the magnitude of his cardiomyopathy and the stress of his job. I think this is something that needs to be considered in the relatively near future."

* On April 22, 2003, Nadim Nasir, M.D., Medical Director of Electrophysiology Laboratories at Texas Medical Center, implanted an atrial biventricular resynchronization defibrillator in Helm. Dr. Nasir indicated that Helm was using a treadmill "for 35 minutes without fatigue or SOB."

* On May 7, 2003, Dr. Nasir noted that Helm "[r]eally has not had much fatigue or SOB before device. Same now as before."

* June 30, 2003, was Helm's last day on the job. It was at this point that he applied for benefits under the Plan.

* On August 22, 2003, Dr. Torre completed an Attending Physician's Statement ("APS") in which he noted a diagnosis of systolic heart failure, and assessed Helm as having slight to moderate limitation of cardiac function, moderate limitation of physical function, and ability "to engage in only limited stress situations and engage in only limited interpersonal relations."

[7]Shortness of breath.

Dr. Torre defined "stress as it applies to this patient" as "high level decision making." He opined that Helm was capable of working within his limitations, and of working at another occupation on a full-time basis, but that job modification (presumably referring to Helm's own occupation) would not enable Helm to work with his impairments.

* On August 26, 2003, Dr. Staggs completed an APS in which he noted a diagnosis of dilated cardiomyopathy and assessed Helm as having marked limitation of cardiac function, moderate limitation of physical function, and slight limitation as to stress situations and interpersonal relations. Dr. Staggs defined "stress as it applies to this patient" as "Hospital Administrator." He opined that Helm was not capable of working at another occupation on a full-time basis and would never be able to do so, even with vocational rehabilitation and job modification.

* On November 19, 2003, William Watson, M.D., conducted a review of Helm's file for Sun Life. Dr. Watson noted the improvement in Helm's condition following medication and the implantation of the defibrillator. He noted that Helm was working in April, 2003, before the defibrillator was implanted, and concluded that he was "not apparently disabled" at that time and had improved since. He noted there was no evidence of congestive heart failure or coronary artery disease. He stated that "[s]tress would cause an increase in B[lood] P[ressure] and/or

heart rate," and that there was "no evidence that this is the case." He found Helm had "very few limitations other than his weight." Dr. Watson did not discuss the impact stress might have or not have on Helm's cardiomyopathy.

* Sun Life sent a copy of Dr. Watson's report to Dr. Staggs for comment. On December 8, 2003, Dr. Staggs wrote: "I must strongly disagree with [Dr. Watson's] assessment of Mr. Helm. He has merely reviewed records. I have actually seen Mr. Helm, both as a patient and in his capacity as a hospital administrator, and I do not feel, given his cardiac status, that he is able to resume such a high-stress job. In fact, I think it would be markedly detrimental to his health to do so and I will strongly advise him against that. I believe that a good bit of Mr. Helm's functional improvement has been from the fact that he is no longer fully engaged as a hospital administrator, and to resume that type of activity I think would be detrimental. Given an ejection fraction of 17% when diagnosed and the fact that he will eventually likely be a candidate for cardiac transplantation, I just cannot in good conscience agree with this assessment from your consultant."

* On January 6, 2004, Gregory McWilliams, D.O., a Cardiologist, conducted an independent medical examination of Helm at the request of Sun Life. He also reviewed Helm's medical records. Dr. McWilliams opined as follows:

"At this time Mr. Helm is in a vigorous exercise rehab program at a local fitness center. He has employed a personal trainer to improve his physical condition. He performs weight lifting as well as aerobic exercise for approximately an hour, 3 to 4 times a week. Patient denies angina type symptoms. He rarely naps throughout the day. He continues to be active. Major complaint is one of fatigue at the end of the day."

"At this time it appears that the patient's dilated idiopathic[8] cardiomyopathy has improved with the aid of vigorous medical therapy as well as biventricular pacing with an ejection fraction of 20% to 30%. Based on the objective medical evidence it is accurate to say that his cardiomyopathy may improve slightly but I would doubt if the ejection fraction improved over 35%. At this time the patient has no symptoms of congestive heart failure other than fatigue."

"With the findings of a current ejection fraction with 20% to 30% with excellent medical therapy as well as defibrillator and biventricular pacing, I would preclude Mr. Helm from performing activities in a high stress situation. I feel that high stress, long hour workload, whether they are sedentary or not, would contribute to his demise. I feel that Mr. Helm can work in a sedentary capacity although not in a position that includes a high level of stress. He should not be in a position that has a long

[8]Of unknown cause.

hour workload."

"His inability to perform in a sedentary capacity with a high level of stress is due to his cardiomyopathy."

* On February 20, 2004, Sun Life notified Helm that it had approved his claim for "own occupation" LTD benefits, payable as of September 29, 2003.

* On July 13, 2004, Karla Forgiel, a Fellow of the American Board of Vocational Experts, conducted an Employability Assessment of Mr. Helm at Sun Life's request. Forgiel calculated that Helm's "gainful wage" was $57 per hour. She noted that the most recent medical documentation (the report of Dr. McWilliams) indicated that Helm was able to do sedentary work but not with a high level of stress, due to his cardiomyopathy. Forgiel also found that Helm could perform other occupations in his geographical area, but could not earn in the range close to his targeted gainful wage. As she explained, "top executives are among the highest paid workers; however, long hours, considerable travel, and intense pressure to succeed are common." She concluded that Helm could not do his own occupation, and stated "I cannot identify any other occupation that Mr. Helm can do and earn the required $57 per hour."

* On August 18, 2004, Dr. Nasir noted that Helm had no chest pain, palpitations, or dizziness, and that his dyspnea had not increased. Helm was "walking 3 to 4 miles a day and also

exercising 3 days a week without any problems."

* On August 19, 2004, Dr. Torre completed an APS, assessing Helm only slight limitations as to physical functioning, cardiac functioning, and engaging in stress situations. He opined that Helm was capable of working full-time within his limitations, but noted that he had not reviewed the duties of Helm's occupation.

* On November 15, 2004, Dr. Staggs noted that Helm had gained weight "despite pretty vigorous physical exercise," and that he "has had no chest pain and no real dyspnea. He still fatigues a little easily but I think has stayed fairly stable."

* On February 16, 2005, Helm saw Dr. Torre, who noted that he "exercises for approximately 1 hour on a treadmill four days a week, without difficulty," but "does get short of breath while climbing upstairs."

* On February 25, 2004, Dr. Torre noted that a recent echocardiogram showed an ejection fraction of 40-44%.

* Helm saw Dr. Nasir on March 2, 2005. On that visit his ejection fraction was up to 46% and he "feels fine."

* On July 19, 2005, Dr. Staggs completed an APS, in which he noted severe limitation of functional capacity, marked restriction of cardiac function, and stated that Helm was permanently incapable of part-time or full-time work. Dr. Staggs added the following note: "Although Mr. Helm has stabilized, he

has severe heart disease and physical impairment. He is strongly advised against resuming work, even sedentary, as it is my opinion it would shorten his life expectancy."

* On July 31, 2005, Helm completed a Claimant Activity Questionnaire. In it he indicated that his activities were limited by general fatigue and that he had decreased ability to think and concentrate since his condition began.

* September 28, 2005, was the end point of the 24-month "own occupation" period for payment of LTD benefits. Sun Life continued to pay Helm benefits, however, while it evaluated his case under the "any occupation" clause of the Plan.

* On January 16, 2006, Helm saw Dr. Staggs for "complete physical reassessment." He complained of tiring easily and shortness of breath especially when climbing stairs. He had recently fallen when getting up out of a chair, but did not know if he had passed out or not. Dr. Staggs noted "[o]f significance is the fact that his heart size has decreased quite a bit."

* On January 24, 2006, an echocardiogram revealed that left and right ventricle and atrial size were normal, with "[b]orderline concentric left ventricular hypertrophy," and ejection fraction was 55-59%.

* On January 25, 2006, Dr. Torre noted that Helm's "symptoms have not changed significantly," that he "gets fatigued with minor physical activity" and short of breath climbing stairs,

but was "able to walk on a daily basis."

* On September 14, 2006, Dr. Staggs saw Helm for reassessment and to complete Social Security disability forms. He noted Helm was "still very limited in his activity levels," and listed as his impressions "[n]onischemic cardiomyopathy, sleep apnea, hyperlipidemia, morbid obesity." He concluded that Helm's "long term outlook is very poor given the constellation of findings that he has." Dr. Staggs completed a Physical Residual Functional Capacity Evaluation in which he opined that Helm's "combination of impairments" would "interfere with sustained work activity," and noted that "[t]his is a chronic condition with an inherently high mortality rate."

* On November 20, 2006, J. Michael Gaziano, M.D., M.P.H., of the Division of Aging at Brigham and Women's Hospital, conducted an evaluation of Helm's medical records at the request of Sun Life. Dr. Gaziano noted the improvement in Helm's cardiac condition since treatment began, and his tolerance of a vigorous exercise program, and concluded that he had "excellent functional capacity" and that "[g]iven his overall cardiac status and his functional capacity on testing and under observation, he should be able to resume his normal work-related activities on a full-time basis."

With regard to the effect of stress on Helm's physical condition, Dr. Gaziano offered the following:

"There is no evidence that avoidance of stressful situations is an optimal strategy for the management of stress or is a means of lowering risk of future events in those with cardiomyopathy. The topic of stress and heart disease is quite complex and involves several issues. The following is a summary of my opinion of several issues regarding the impact of stress on the heart."

"First, is the difficulty we have in defining and assessing 'stress.' Stress is a feeling we all have at various times. Stress is a characteristic of a given individual's reaction to a situation and not an inherent characteristic of any given situation. One person may feel stress in one situation while another may not in that same situation. Since it is a characteristic of the individual and not a specific situation, it is likely that the individual who feels stress in one situation may have stress under other circumstances. Thus, it is not clear that avoidance of a certain situation will reduce stress in a patient's life. If a patient has what I feel to be excessive anxiety at work (or in other situations such as at home) that precludes someone from working, I generally feel that issue must be addressed by a specialist who deals with stress and I will make a referral to a psychiatrist."

Dr. Gaziano also opined that "[t]here is no conclusive evidence stress plays a major role in the development of cardiomyopathy. Further, there are no data that suggest the

avoidance of work, as a management strategy designed to address work-related stress will in any way impact the course of this condition." He stated that Dr. Staggs' opinion, that return to his job would shorten Helm's life expectancy, "is not supported by the literature. . . . There is no evidence that avoidance of the type of largely sedentary work that Mr. Helm engaged in will prolong life or engagement will shorten it."

* On December 6, 2006, Sun Life notified Helm that it found him no longer qualified for benefits under the Plan. It relied largely on Dr. Gaziano's opinion, but also on surveillance tapes of Helm showing him engaging in normal activities such as driving a car, doing errands, and campaigning for public office. Sun Life relied in particular on the fact that Helm ran for election to the Arkansas House of Representatives in 2006, which it considered inconsistent with the functional abilities assessed by Helm's treating physicians.

* Helm appealed this decision, and on February 13, 2007, submitted letters from Dr. Torre (dated February 2, 2007) and Dr. Nasir (dated February 5, 2007). Dr. Torre reiterated his opinion that in spite of medical improvement in his condition, Helm "continues to have symptomatic diastolic heart failure and left ventricular hypertrophy," and "qualifies for disability based on diastolic heart failure, left ventricular hypertrophy and cardiomyopathy.

Dr. Nasir stated that although Helm "has had an excellent response to therapy, he continues to have a serious and life-threatening medical condition, namely nonischemic cardiomyopathy, and requires continued therapy with heart failure medication and continued treatment with his implantable defibrillator delivery cardiac resynchronization therapy to maintain his current level of functional capabilities. In my opinion, a significant portion of his improvement has come as a direct result of avoiding the substantial stresses experienced in his former day-to-day employment. Continuing to avoid these physical and emotional stresses would be an important and continuing part of his therapy."

* Sun Life submitted Helm's file to Gregory Helmer, M.D., a Cardiologist, for review. Dr. Helmer was asked to identify "any functional restrictions and/or limitations that are supported by the medical evidence." Dr. Helmer stated that he "agree[d] with Dr. Gaziano's recommendation in that I would not limit his standing or walking," and noted that "regular activity, actually walking and exercise would be recommended, as I would agree that it would be best to have him work to his full functional ability." Dr. Helmer was not asked to opine about the effect of stress on Helm's underlying heart disease, nor did he do so. He limited his "agreement" with Dr. Gaziano's recommendation in such a way that it did not encompass Dr. Gaziano's opinion about stress.

* On May 14, 2007, Sun Life notified Helm that it had concluded "that the decision to deny further benefits on this claim was appropriate." The letter noted that "when considering the duties of Mr. Helm's occupation, his education, training, experience, and the medical documentation on file, we have determined that he has the capacity to perform the essential duties of his own as well as any occupation. . . ."

8. As can be seen from the foregoing summary of the Administrative Record, there is no disagreement that Helm has a life-threatening medical condition; that it became symptomatic in November, 2002; that it was appropriately treated; that Helm experienced significant improvement; and that Helm is today fully capable of working at sedentary occupations that do not include a significant component of job stress. The dispute in this matter centers entirely on the impact of stress on Helm's medical condition, and the issue before the Court is whether there is substantial evidence to support Sun Life's decision that job stress would have no adverse effect on Helm.

Helm's treating physicians, Dr. Staggs, Dr. Torre, and Dr. Nasir, are all of the opinion that Helm cannot resume his own occupation or work under stress. Dr. Staggs is of the opinion that it would shorten Helm's life expectancy to do so; Dr. Nasir is of the opinion that the improvements in Helm's condition are related to the relief from stress he experienced by leaving his

job.

Dr. McWilliams, the independent medical examiner engaged by Sun Life, agreed with Helm's doctors on the issue of stress. He was of the opinion that stress would contribute to Helm's demise.

Sun Life's consultant Dr. Watson did not concede that Helm was subjected to any job stress, an opinion the Court rejects in light of Helm's job description[9] and Sun Life's own consultant Forgiel, who opined that in the type of work Helm did, "intense pressure to succeed" is common.

Sun Life's consultant Dr. Helmer was not specifically asked to comment on the effect of stress on Helm's health, and avoided offering any such comment, focusing instead on Helm's functional limitations and limiting his agreement with Dr. Gaziano's opinion to functional ability. Since there is no dispute that Helm can work at low-stress sedentary occupations without increased risk, and the impact of stress had become the central issue in the case by the time Dr. Helmer was consulted, the Court finds these aspects of the query to Dr. Helmer, and Dr. Helmer's response, significant.

Arrayed against all these opinions -- which either strongly

---

[9]According to Helm's Job Description, he "administers, directs, and coordinates all activities of the Medical Center to carry out its objectives in the provision of health care, furtherance of education and research, and participation in community health programs." He supervised the Executive Vice President, Vice President Finance and Information, Director of Medical Affairs, Internal Auditor, and Administrative Assistant. He "sometimes" worked "long and irregular hours," and was expected to "[c]ontinually demonstate[] a helpful, positive attitude, through patience, tact, and courtesy in the daily contacts with co-workers, patients, and general public."

support Helm's position, or are essentially neutral -- is the lone opinion of Dr. Gaziano, who opined that there is "no conclusive evidence stress plays a major role in the development of cardiomyopathy," and "no evidence that avoidance of stressful situations . . . is a means of lowering risk of future events in those with cardiomyopathy."

The rule in this Circuit is that "[w]hen there is a conflict of opinion between a claimant's treating physicians and the plan administrator's reviewing physicians, the plan administrator has discretion to deny benefits unless the record does not support denial." **<u>Johnson v. Metropolitan Life Insurance Company</u>, 437 F.3d 809, 814 (8th Cir. 2006).** In the case at bar, there is not only a conflict between Helm's treating physicians and Sun Life's consultant Dr. Gaziano, there is a conflict between Sun Life's consultant Dr. Gaziano and its independent medical examiner Dr. McWilliams. This fact considerably lessens the discretion the Court affords to Sun Life's reliance on Dr. Gaziano.

While ERISA plan administrators "are not obliged to accord special deference to the opinions of treating physicians," they cannot "arbitrarily refuse to credit a claimant's reliable evidence." **<u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 825, 834 (2003).** Without question, Helm offered reliable evidence. His treating physicians are all highly trained medical professionals at respected medical facilities who treated Helm

over a long period of time, not general practitioners or practitioners in unrelated fields who offered uninformed opinions after only one or two consultations. Their opinions are based on objective tests reflecting a serious medical condition, not simply on the subjective complaints of their patient.

In accepting the isolated opinion of Dr. Gaziano, Sun Life refused to credit all this evidence. That such refusal was arbitrary is shown by Sun Life's own conduct in picking and choosing -- from among several consultants -- the one whose opinion was preferred.

9. Sun Life contends that it did not disregard Dr. McWilliams' opinion, but rather that between the date of Dr. McWilliams' exam and its termination of benefits, Helm's condition improved to the point that he was no longer disabled. The Court might be inclined to consider this argument more favorably had Sun Life asked Dr. McWilliams if this improvement altered his opinion, or had it asked Dr. Helmer to evaluate the impact of stress on Helm. Sun Life's failure to do so, as to both Dr. McWilliams and Dr. Helmer, undermines its position that Helm's improvement had ended his disability. Nor do the surveillance records, so touted by Sun Life, prove its case. The fact that a person can drive a car, put up campaign signs, make campaign speeches, and expect to serve as a state representative does not prove his ability to carry out the duties of a high stress employment position. The

activities shown by surveillance are not particularly high-stress activities[10].

10. The case relied upon most heavily by Sun Life, **Leipzig v. AIG Life Insurance Co., 362 F.3d 406 (7th Cir. 2004)**, is readily distinguishable from Helm's case. It was decided before the Supreme Court handed down **Glenn**, and the Seventh Circuit fully deferred to the administrative decision. Indeed, the court there -- while unwilling to assume any conflict of interest on the part of a plan administrator who was also the plan insurer -- apparently agreed with the plan administrator's view that

> Leipzig's own doctors likely had taken their more conservative position at his request. Most of the time, physicians accept at face value what patients tell them about their symptoms; but insurers such as AIG must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk).

In the case at bar, the medical records show that Helm did not exaggerate his symptoms to obtain a favorable report from his doctors. He complained of little more than fatigue and shortness of breath throughout the time period covered by this case. The idea of medical retirement does not appear to have originated with Helm, but rather was suggested and recommended by Dr. Staggs.

In addition, in **Leipzig** the plan administrator's independent medical examiner found the claimant not disabled, and thus

[10] The Court recognizes that for some people making a speech is a high-stress activity, but for many others it is a natural and comfortable thing. There is no evidence in the Administrative Record that public speaking was a stressor for Helm.

supported the termination of benefits. Here, the Plan Administraator's independent medical examiner found Helm unable to return to his own occupation, or any high stress occupation.

11. The Court did not take into consideration certain evidence relating to Social Security disability benefits. After submission of the briefs in this matter, Helm filed a Motion To Supplement Record (document #15), in which he asks the Court to include in its review a recent favorable Social Security disability decision. This motion was opposed by Sun Life.

The motion will be denied. The Court has not considered either the first (unfavorable) Social Security disability decision, or the second (favorable) one. Neither decision is particularly informative, and the standards for granting benefits under the Plan are quite different from those required to obtain Social Security benefits. In addition, the second Social Security decision was not rendered in time to be considered by Sun Life in making its benefits decision.

12. When the Court considers all the evidence in light of the reduced level of deference it finds appropriate, given the fact that Sun Life stood to save an enormous sum of money by terminating Helm's benefits, it concludes that Sun Life arbitrarily chose to accept the opinion of Dr. Gaziano over the opinions of Dr. Staggs, Dr. Torre, Dr. Nasir, and Dr. McWilliams. The opinions of Dr. Staggs, Dr. Torre, Dr. Nasir, and Dr.

McWilliams all support a finding of disability. Under these circumstances, the benefits decision is subject to reversal.

The parties agree that benefits of $10,000.00 per month were terminated on or about November 30, 2006. The Court, therefore, finds Helm entitled to judgment in the amount of $240,000.00 for unpaid accrued benefits as of the date of this Order. Judgment in that amount will be entered when the issues of pre-judgment interest, attorney's fees, and costs have been resolved.

The Court also finds that Helm is entitled to immediate reinstatement of benefits, and payment of same as long as he remains eligible.

**IT IS THEREFORE ORDERED** that the decision of Sun Life Assurance Company of Canada to terminate ERISA benefits to Michael D. Helm under the Sparks Health System employee welfare benefit plan is **reversed**.

**IT IS FURTHER ORDERED** that Michael D. Helm is entitled to judgment against Sun Life Assurance Company of Canada in the sum of $240,000.00 for past benefits accrued but unpaid as of the date of this Order, for which judgment will be entered when issues of pre-judgment interest, attorney's fees, and costs have been resolved.

**IT IS FURTHER ORDERED** that Sun Life Assurance Company of Canada reinstate benefits payments to Michael D. Helm, and continue paying same for as long as he remains eligible.

**IT IS FURTHER ORDERED** that any petition for pre-judgment interest, attorney's fees, and costs be filed within fourteen days of the date of this Order, and that any objection thereto be filed within eleven days thereafter.

**IT IS SO ORDERED.**

**/s/ Jimm Larry Hendren**
**JIMM LARRY HENDREN**
**UNITED STATES DISTRICT JUDGE**